2021 IL App (2d) 200417-U
No. 2-20-0417
Order filed April 28, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ARTHUR STRONG, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 19-MR-1054 |
| | ) | 19-MR-1097 |
| | ) | |
| BOARD OF TRUSTEES OF THE NORTH | ) | |
| CHICAGO POLICE PENSION FUND, | ) | |
| GERALD PEDRIN, CURTIS BLAME, | ) | |
| TIMOTHY CLARK, TERESA MCSEE, and | ) | |
| OSCAR GALLARZO, as Trustees in their | ) | |
| Official capacity, | ) | Honorable |
| | ) | Joseph V. Salvi, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Board's determination that the police officer's back injury did not render him disabled was against the manifest weight of the evidence. However, the Board's determination that the officer did not injure his back while performing an act of duty was *not* against the manifest weight of the evidence. The applicant is entitled to a non-duty pension. The decision of the Board is affirmed in part and reversed in part. The decision of the circuit court, which reversed the Board in total, is affirmed in part and reversed in part.

¶ 2    Plaintiff, Arthur Strong, applied for a line-of-duty disability pension pursuant to section 3-114.1 of the Illinois Pension Code (40 ILCS 5/3-114.1 (West 2018) (entitling an officer to a retirement pension of 65% of his or her salary) and, in the alternative, a non-duty disability pension pursuant to section 3-114.2 of the Code (40 ILCS 5/3-114.1 (West 2018) (entitling an officer to a retirement pension of 50% of his or her salary).  Strong, a police officer for the North Chicago Police Department (Department), alleged that, on October 25, 2015, he was in a traffic accident while on duty and in pursuit of a suspect.  Strong further alleged that, as a result of the accident, he injured his back.

¶ 3    Defendant, the Board of Trustees of the North Chicago Police Pension Fund (Board), denied Strong's application.  The Board primarily determined that Strong was not eligible for a disability pension, because he was no longer a police officer at the time of his application.   Strong submitted his pension application *after* signing but *before* submitting a resignation agreement to the City of North Chicago (City).  The Board secondarily determined that Strong was not disabled, and, even if he was, the disabling injury was not a result of the October 25, 2015, traffic accident.

¶ 4    On administrative review, the circuit court reversed the decision of the Board, finding: (1) Strong was eligible for a disability pension, because he remained a police officer until he submitted the resignation agreement; (2) Strong was disabled; and (3) the disability was caused by the October 25, 2015, traffic accident.

¶ 5    The Board appeals to this court.  The Board now concedes that Strong was eligible for a disability pension.  However, it maintains that Strong was not disabled and, even if he was, the disabling injury was not a result of the October 25, 2015, traffic accident.  For the reasons that follow, we hold that the Board's disability determination was against the manifest weight of the evidence, but its causation determination was not.  Strong is entitled to a non-duty pension.  The

decision of the Board is affirmed in part and reversed in part. The decision of the circuit court, which reversed the Board in total, is affirmed in part and reversed in part.

¶ 6                                     I. BACKGROUND

¶ 7      In 2005, the Department hired Strong. Strong was a lateral hire with six years' experience with the Dalton Police Department and, as such, he did not submit to a pre-employment physical test. In 2010, Strong was in a traffic accident while on duty. The 2010 accident is not at issue here. It is important only because, following the 2010 accident, Strong underwent an MRI which revealed no abnormalities in his back. Strong returned to full-duty police work, where he remained until the instant, October 25, 2015, traffic accident. Following the 2015 accident, Strong reported knee pain and was assigned desk duty. In January 2016, Strong first reported back pain. A 2016 MRI revealed abnormalities in Strong's back. Strong received treatment, such as physical therapy and steroid injections. Strong's pain did not subside and, in November 2016 and December 2016, Strong underwent successive back surgeries. From December 2016 to January 2019, Strong continued to seek treatment to manage his back pain.

¶ 8      Strong did not return to work with the Department following the 2016 back surgeries. Instead, he received payments equal to 100% of his salary under the Public Employee Disability Act (PEDA) (5 ILCS 345/1 *et seq*.) (West 2016). Strong also obtained secondary employment, working security for Target and as an Uber driver. According to the City, Strong was not permitted to obtain secondary employment while receiving PEDA payments.

¶ 9      The City began to investigate Strong. The City hired a field investigator to surveil Strong from January through March 2018. The investigator observed Strong working as an Uber driver on five separate days in March. The investigator also videotaped Strong placing a suitcase in the trunk of a vehicle while working as an Uber driver.

¶ 10     On March 19, 2018, the City served Strong with a "Notice of Interrogation and Order," informing him that it was in the process of investigating allegations of "serious misconduct" against him. Specifically, the City charged that Strong: (1) exaggerated or falsified his injuries for the purpose of deriving benefits that he was not legally entitled to receive, including benefits under PEDA; (2) engaged in unauthorized secondary employment; (3) engaged in conduct unbecoming of a police officer in that, on February 8, 2018, Strong battered a child; and (4) failing to inform the Department that, as a result of the February 8, 2018, incident, a complaint and notice to appear had issued.

¶ 11     Shortly after Strong received notice of the interrogation, he, with union representation, negotiated a resignation agreement with the City. The resignation agreement provided in relevant part:

"WHEREAS, the CITY has been contemplating the termination of STRONG's employment;

WHEREAS, the Parties desire to amicably settle all claims ***

* * *

NOW, THEREFORE, *** the Parties agree as follows:

* * *

2. Resignation as a Voluntary Act: STRONG shall submit an irrevocable letter of resignation no later than 5:00 p.m. on March 30, 2018[.] The resignation shall be deemed accepted as soon as it is received and will be effective the day it is *submitted*. STRONG acknowledges that his resignation is a voluntary act.

If STRONG fails to exercise the resignation notice prior to 5:00 p.m. on March 30, 2018, STRONG's employment shall automatically be terminated at 5:01 p.m. for the

reasons cited in the interrogation notice, and STRONG and the UNION agree not to contest that termination in any forum.

* * *

4. Pending Investigation: As long as STRONG issues his irrevocable resignation notice prior to 5:00 p.m. on March 30, 2018, the CITY agrees to close its investigation file into the allegations of the interrogation notice issued on March 19, 2018. The CITY also agrees to issue no findings based on those investigations. ***.

5. PSEBA Benefits: STRONG acknowledges and agrees that the incident giving rise to his alleged workplace injuries do not qualify as a catastrophic injury incurred in the line of duty *during a fresh pursuit*, in response to what was reasonably believed to be an emergency, in response to an unlawful act perpetrated by another, or during the investigation of a criminal act [so as to qualify for the receipt of PSEBA health benefits in retirement]. ***." (Emphases added.) [1]

¶ 12    On March 23, 2018, Strong signed the resignation agreement. On March 26, 2018, the City, through its mayor, signed the agreement. On March 30, 2018, Strong submitted the executed resignation agreement to the City.

¶ 13    Meanwhile, on March 29, 2018, one day before he submitted the resignation agreement, Strong applied for line-of-duty disability pension benefits. He later amended his application to seek non-duty disability pension benefits in the alternative.

¶ 14                                A. The Hearing for Pension Benefits

---

[1] Public Safety Employee Benefits Act (820 ILCS 320/1 *et seq*.) (West 2018).

¶ 15     On June 11, 2019, the Board conducted a hearing on Strong's application for pension benefits. Strong was the only witness to testify. The Board also considered accident reports, Department reports and records, and medical reports.

¶ 16                                        1. Strong's Testimony

¶ 17                          i. The Accident, Treatment, and Prognosis

¶ 18     Strong testified to the October 25, 2015, traffic accident. The accident occurred at approximately 11:30 a.m., in the middle of Strong's shift, while he was performing routine patrol in his squad car. Strong was traveling southbound on the 1300 block of Lincoln when he saw four individuals in a vehicle. As he drove past, he smelled what he believed to be the scent of burnt cannabis emanating from the vehicle. Strong turned around, intending to initiate an investigatory stop. As Strong approached, the suspects drove off, traveling eastbound on 14th Street. Strong followed the suspects down 14th Street. He sped up, trying to gain on the suspects' two-block lead. However, he did not turn on his lights and siren. At the intersection of 14th and Glenn Drive, Strong "T-boned" an unrelated vehicle that had failed to stop at a stop sign. Strong acknowledged that, had he turned on his lights and siren, his automatic camera would have activated. He then stated that he had an older squad car, which may not have been equipped with an automatic camera.

¶ 19     After the accident, Strong was taken to the emergency room at Lake Forest Hospital via ambulance. He did not require assistance to enter the ambulance. Strong recalled that Lake Forest Hospital performed x-rays. He believed that the x-rays were of his back; he did not recall whether any other x-rays were performed. Strong informed the emergency room doctor of pain on the right side of his back and of knee pain. As time went on, Strong's back pain migrated to the lower portion of his back.

¶ 20    Lake Forest Hospital referred Strong to the Illinois Bone & Joint Institute, where he received treatment for his back and knees. Strong's testimony regarding his 2016 treatment at the Illinois Bone & Joint Institute was consistent with the medical records, which we detail below. For now, we note that Strong underwent two back surgeries, in November and December 2016.

¶ 21    After the second back surgery, Strong continued to experience pain in his lower back, tingling down his left leg, and numbness in his foot. Strong last saw a doctor for his back in January 2019, and he continues to follow the guidelines given at his most recent appointment. It is possible that he will need a third surgery in the future.

¶ 22    Strong testified to his present condition:

        "Again, some days are better than others. Sometimes I have pain and I have to take the medications that I'm on. I can do moderate, you know, moderate like for example my everyday lifestyle going to the grocery store, things of that nature, I can do moderate exercise but nothing *** like I would be able to do prior to this—this incident."

¶ 23    Strong had no serious back problems prior to the October 2015 accident. He had been working full duty without restrictions. He could bench press 300 pounds. As recently as 2010, Strong had an MRI performed on his back, and that MRI had revealed no abnormalities.

¶ 24                    ii. Strong's Return to Work and Secondary Employment

¶ 25    On December 23, 2015, Strong returned to work, albeit in an administrative capacity. Because Strong returned to work, he did not receive PEDA payments. However, after his second back surgery in December 2016, Strong did not return to work. At that time, he began to receive PEDA payments.

¶ 26    In December 2016, Strong applied for a position with the Lake County Sheriff's Office. He received an interview but was not hired. He believes that he was not hired because, due to his

2021 IL App (2d) 200417-U

recent surgery, he could not start right away. At the time he applied, he did not realize that his pain would not improve. As of 2019, Strong was retraining for a second career in IT.

¶ 27    Strong has pursued secondary employment since 2010. From 2010 to 2013, he worked security at Walmart. From 2013 to 2018, he worked intermittently as an Uber driver. From 2017 to 2018, he worked security at Target. On a typical day, Strong would perform light-duty police work from 8 a.m. to 4 p.m. Then, he would go to work at Target from 5 p.m. to 10 p.m. Strong's duties at Target did not require him to do "anything physical." He simply monitored the parking lot while in a security vehicle. The security vehicle served as a deterrent. If Strong observed suspicious actions, he would radio his supervisor and the police would be called to handle the situation.

¶ 28    Strong addressed the March 19, 2018, charge that he engaged in unauthorized secondary employment:

> "I had no doctor's restrictions on driving and that was the only thing my part[-]time employment entailed me to do. So I didn't believe I was doing anything wrong.
>
> * * *
>
> Also, again, I have, you know six children and at the time *** my eldest was in her first year of college. So when—most of you I've worked with, worked for, know I've worked a lot of overtime when I worked on the PD. I worked a lot of secondary employment and with one in college and with other things not being afforded to me because of this injury things get tight so I had to find something I could do to make up that money ***."

Counsel for the Board asked for clarification:

> "Q. So what [were] the exact charges?

> A. He was saying that I was working secondary employment while receiving PEDA benefits and I was not allowed to do that.
>
> Q. Just one charge?
>
> A. That's all I recall, yes."

Strong did not mention the other charges.

¶ 29                              2. Accident Reports and 2015 Treatment

¶ 30    The October 25, 2015, police accident report contained information about the vehicle that Strong hit. According to the report, the scent of burnt cannabis could be detected in *that* vehicle. (The police also found actual cannabis and a firearm.) The report did not mention that Strong had been pursuing a different vehicle prior to the crash.

¶ 31    Similarly, an October 25, 2015, internal Department report titled "Accident/Investigation Form" did not mention that Strong had been pursuing another vehicle prior to the crash. Instead, in the box labeled "Describe What Happened," the report detailed only the physical aspects of the crash, such as the directions in which the vehicles traveled. Also, the report did not mention a back injury. Instead, in the section labeled "Part of Body Injured," the following boxes were checked: head (headache), left wrist, left knee, left lower leg, and left ankle. The box marked "back" was not checked. The report was not signed.

¶ 32    Another October 25, 2015, Department report, this one titled "Employer's First Report of Injury," likewise failed to mention that Strong had been pursuing another vehicle prior to the crash. Instead, in the box labeled "What was the Employee Doing When the Accident Occurred," the report stated: "Driving [westbound on] 14 St." In the box labeled "How Did the Accident Occur," the report again detailed only the physical aspects of the crash. The report was signed by "Sgt. Thomas."

¶ 33    The October 25, 2015, Lake Forest Hospital emergency room records do not show that Strong received a back x-ray.  In fact, the records do not show any report of back pain at all.  Instead, the records show that Strong received knee and chest x-rays.

¶ 34    Other 2015 medical records documented the following.  On October 29, 2015, Dr. Young Nahm Lee from the Waukegan Clinic treated Strong for knee, ankle, shin, and wrist pain.  Lee wrote: "[Strong] reports *** no back pain."

¶ 35    On November 13, December 2, and December 30, 2015, Dr. David Hamming of the Illinois Bone & Joint Institute treated Strong.  At the first two appointments, Hamming diagnosed and treated Strong for plantar fasciitis.  Hamming observed that Strong walked normally.  At the third appointment, Hamming treated Strong for knee pain.  Hamming reported that Strong had normal sensation throughout the leg.  At none of the appointments did Hamming document any complaint of back pain.

¶ 36                    3. Strong's First Report of Back Pain: 2016 Forward

¶ 37        i. January 2016 to September 2016: Dr. Rhutav Parikh Recommends Surgery

¶ 38    On January 4, 2016, Dr. Rhutav Parikh of the Illinois Bone and Joint Institute treated Strong for low back pain.  Strong reported that he had been experiencing back pain since October 25, 2015, when he was involved in a car accident.

¶ 39    Parikh diagnosed Strong with a lumbar strain and right lumbosacral radiculitis.  Parikh prescribed: medication (Skelaxin and Methylprednisolone), physical therapy (twice per week for four weeks), and work restrictions (a 10-pound lifting restriction; avoid bending and twisting).  Initially, Strong was not able to participate in physical therapy, because his workers' compensation claim was denied.  (The denial was later reversed.)

¶ 40    On January 25, February 15, and February 25, 2016, Parikh again treated Strong for a lumbar strain and right lumbosacral radiculitis. Parikh ordered an MRI, which showed a "focal right-sided abnormality" and a left-sided disc herniation at L5-S1.

¶ 41    On July 20, 2016, after a five-month gap in treatment, Parikh again treated Strong. Strong complained that his symptoms had not improved. Parikh diagnosed Strong with a left lumbosacral radiculopathy secondary to left L5-S1 disc protrusion. Parikh prescribed epidural steroid injections at the L5-S1 site, which Strong received.

¶ 42    On September 26, 2016, Parikh recommended that Strong consider surgical intervention. Strong claimed that his pain was aggravated by prolonged sitting, bending, twisting. He also had restricted range of motion. His symptoms had not improved.

¶ 43                          ii. October 2016 to October 2017:

Dr. Juan Alzate Performs Surgery and Strong Continues Treatment

¶ 44    On October 17, 2016, Dr. Juan Alzate of the American Center for Spine and Neurosurgery examined Strong. Alzate documented Strong's claim that his back pain began after an October 2015 car accident. Ultimately, Alzate recommended surgery. Thus, on November 2, 2016, Alzate performed a L5-S1 hemilaminectomy. On December 7, 2016, Alzate performed a second surgery, a microdiscectomy.

¶ 45    On December 30, 2016, Alzate examined Strong and noted improved symptoms. Whether Strong could return to his full duties as a police officer would be decided at the end of physical therapy. From January 2017 to May 2017, Strong participated in physical therapy. Although he continued to experience some pain and numbness, he reported that physical therapy improved his symptoms.

¶ 46    On May 3, 2017, Strong had a postoperative MRI which showed the following. At L2-L3, there was moderate bilateral degenerative facet arthropathy. At L3-L4, there was mild to moderate bilateral degenerative facet arthropathy. At L4-L5 there was moderate bilateral degenerative facet arthropathy with prominence of the ligamentum flavum, slightly greater on the left. At L5-S1, the posterior spinal canal was partially decompressed. There was mild bilateral degenerative facet arthropathy and mild intervertebral disc space narrowing, which was causing mild left neural foraminal stenosis. However, there was no evidence of residual or recurrent disc disease.

¶ 47    From May 2017 to August 2017, Strong received steroid injections to manage his pain. Dr. Jay Hurh noted that physical therapy no longer appeared to be alleviating Strong's pain. Hurh further noted that the surgeries had left Strong with scar tissue that pressed on his nerves.

¶ 48    On October 6, 2017, Alzate opined in a medical report that Strong had reached maximum medical improvement. As such, a third surgery was an option, specifically, a fusion with instrumentation. Alzate did not believe a third surgery was needed "at this moment," however. Instead, he advised a Functional Capacity Evaluation. He opined that Strong was unable to return to work as a police officer.

¶ 49                    iii. June 2016 to August 2017:

Dr. Carl Graf Performs Several Independent Medical Exams

¶ 50    In approximately June 2016, the Department referred Strong for an independent medical exam in relation to Strong's workers' compensation claim. Dr. Carl Graf of the Illinois Spine Institute examined Strong on June 23, 2016, November 28, 2016, and August 4, 2017. In June 2016, Graf observed the L5-S1 disc herniation and opined that Strong was capable of performing light duty work. In November 2016, Graf agreed with Alzate's surgery recommendations. Graf predicted that, after surgery and physical therapy, Strong could return to full duty. In August 2017,

after the surgery, Graf opined that Strong could return to medium physical demand work. Graf observed that Strong demonstrated a normal gait and could perform a three-quarter squat. However, Strong relied on pain medication. Strong reported that his pain was a 7 out of 10. Graf recommended that Strong receive clearance from occupational health before returning to street duty, based on the pain medications he was taking. Graf also recommended that Strong consider a third surgery and/or undergo a Functional Capacity Evaluation.

¶ 51    Graf opined as to causation on two occasions. In November 2016 he stated, "*Based on the records provided*, [the disability] would appear to be causally related to the claimed accident from October 25, 2015 in question." (Emphasis added). In August of 2017, he stated, as a general introduction to Strong's medical history, that the Department should "note that statements below were made by Mr. Strong and may or may not be consistent with the medical records provided." With that said, he went on to determine: "It is my opinion that the initial disc herniation and[,] therefore[,] the current condition is causally related to the [October 25, 2015] claimed injury in question."

¶ 52                          iv. December 2017: Functional Capacity Evaluation

¶ 53    On December 8, 2017, Strong underwent a Functional Capacity Evaluation. The evaluator, Henry Deters, who holds a doctorate degree in physical therapy, tested Strong's pain levels, range of motion, strength, and fitness.

¶ 54    Strong reported his pain as 4 out of 10 before the test, between 4 and 8 out of 10 during the test, and 8 out of 10 after the test. However, Strong was "invalid" on the pain replication test. He showed an organic pain response at 37 pounds and a maximum tolerance of 78 pounds, but these results were inconsistent with his subjective reports of pain. He had "major" complaints of

numbness and tingling throughout the examination. Nevertheless, he showed normal dermatomal general sensation and vibration sensation.

¶ 55 Strong exhibited normal range of motion in his spine. However, while doing squats, he showed a "lack of trunk flexion," significant anterior knee translation, and loss of balance due to significant knee and back pain. Strong did not demonstrate the required positional tolerances for squatting, bending, stooping, kneeling, crouching, and crawling due to knee and back pain. Strong experienced fluctuations in knee and back pain during the examination, which resulted in "inconsistencies" in the performance and tolerance of squatting positions. He could not do more than five squats; however, he was able to stand up from a chair many times.

¶ 56 Regarding strength, Strong performed leg lifts, waist lifts, and floor lifts of 50 pounds. He performed shoulder lifts, overhead lifts, and 30-foot carries of 30 pounds. Strong had mild strength deficits to the left hip flexion (15%) and right knee extension (21%). These results were consistent on repeat trials. He had uneven grip strength due to the amputation of digits two through four on his right hand.

¶ 57 Regarding fitness, Strong was unable to complete the 12-minute stress test on the treadmill at the required speed of 2.0 miles per hour, due to pain. However, he was able to complete the test at a speed of 1.2 miles per hour.

¶ 58 Strong exhibited mild symptom exaggeration behavior. Still, he passed 51 of 69 validity criteria, which "suggests fair effort and valid results" that can be used for medical and vocational planning.

¶ 59 Deters characterized the position of police officer as requiring medium physical demands, including lifting 20 pounds on a frequent basis, 50 pounds on an occasional basis, and 150 pounds on an infrequent basis, such as when apprehending a suspect. However, Strong was able to

complete only light to medium physical demands. As such, Deters determined that Strong was unable to return to work as a police officer.

¶ 60                    4. January 2019: Independent Medical Exams

Drs. Michael Lewis, Mark Neault, and Steven Mardjetko

¶ 61    In January 2019, as part of the pension application process, Strong participated in three independent medical examinations. On January 8, 2019, Dr. Michael Lewis, an orthopedic surgeon from the Illinois Bone and Joint Institute, performed a physical exam. Heading into the examination and as noted in his report, Lewis was aware that Strong had been the subject of surveillance and had been seen lifting a suitcase into a vehicle. Lewis was also aware that Strong had resigned. As to the physical examination, Lewis reported that Strong suffered from continued and persistent back pain. Strong takes codeine twice per week, and gabapentin, nabumetone, cyclobenzaprine, as needed. Strong has a history of arthritis, but, prior to 2015, no history of back pain. Strong had limited yet functional motion in his spine and a mild strength deficit. Pointing to these deficits, medical records, and the Functional Capacity Evaluation, Lewis opined that Strong was unable to return to work as a police officer.

¶ 62    Lewis further opined that the nature of Strong's back injury was consistent with Strong's explanation that the back injury was a result of the October 2015 car accident. Lewis noted that Strong had been able to perform his daily duties as a police officer prior to October 2015 but has not been able to do them since.

¶ 63    On January 15, 2019, Dr. Mark Neault, an orthopedic surgeon from Lincolnshire Orthopedics, examined Strong. Neault reviewed Strong's medical records, including the MRI scans; reviewed the Functional Capacity Evaluation; reviewed Strong's medications; and performed a physical exam. Neault wrote that "[Strong's] physical exam was without any apparent

symptom exaggeration." Neault noted that Strong had undergone appropriate treatment, including physical therapy, medication, steroid injections, and even surgery, yet he still experienced debilitating pain. As such, Neault opined that Strong was disabled to the point that he was not able to perform the duties of a police officer.

¶ 64    Neault further opined that the nature of Strong's back injury was consistent with Strong's explanation as to how it occurred. Neault recognized that Strong did not seek immediate treatment for his back pain. On this point, Neault surmised: "Primary issue during the Emergency Department visit was his knees. Patient admits that the low back pain did not set in until a couple of days after the accident." However, Neault noted that Strong did not have any pre-existing back issues prior to the accident.

¶ 65    On January 16, 2019, Dr. Steven M. Mardjetko of the Illinois Bone and Joint Institute performed a physical examination of Strong. He observed that Strong was able to "heel and toe walk and squat and rise without difficulty today." Mardjetko believed that Strong suffered from discogenic lumbar pain syndrome. He opined that Strong could return to a moderate level of physical activity. He further opined, however, that Strong could not return to work as a police officer. He explained: "In my opinion, it is unlikely that officer Strong would be able to perform at full duty given his current level of symptoms. I agree with Dr. Graf's opinion that he could return to a moderate level of physical activity, but I doubt that this will be enough to allow him to return to full-duty policing." Mardjetko noted that Strong did not have pre-existing condition or abnormality at the L5-S1 level prior to the accident. Like Lewis and Neault, Mardjetko also opined that the nature of Strong's back injury was consistent with Strong's explanation of how it occurred.

¶ 66                    5. Department Surveillance and Other Evidence

¶ 67    The Board viewed the surveillance video, which showed Strong lifting a suitcase for a passenger while working as an Uber driver.  It also reviewed Strong's discipline record with the Department.  Most relevant to Strong's credibility, Strong was found to have falsified a police report several years prior to the accident.  This infraction resulted in a 30-day suspension without pay.

¶ 68                              B. The Board's Decision

¶ 69    On October 8, 2019, in a written order, the Board denied Strong's application for disability pension benefits.  Primarily, the Board determined that Strong was not eligible to apply for a disability pension.  It explained that an applicant must be a police officer at the time of his or her application, and it determined that Strong ceased being a police officer on March 23, 2018, when he signed the resignation agreement.  In the Board's view, Strong was no longer a police officer on March 29, 2018, when he applied for a disability pension.

¶ 70    Secondarily, the Board determined that, even if Strong were eligible, his back injury did not qualify as a disability.  On the question of disability, the Board wrote: "[Strong is] not disabled from the performance of patrol officer duties for the North Chicago Police Department."  The Board did not provide an explanation for this determination.

¶ 71    The Board further determined that, even if Strong's back injury qualified as a disability, the injury was not duty-related.  On the question of causation, the Board wrote:

> "The Pension Board rejects the Applicant's claim that the vehicle accident on October 25, 2015, caused a back injury.  The Pension Board rejects the claim that the Applicant was in pursuit of another vehicle when struck on October 25, 2015.  The Pension Board rejects the Applicant's testimony at the hearing. The Pension Board finds the Applicant's testimony as not creditable."

Strong sought administrative review before the circuit court.

¶ 72                                    C. The Circuit Court's Order

¶ 73    The circuit court reversed the Board's decision.  First, the circuit court determined that Strong was eligible to apply for a disability pension.  The plain terms of the resignation agreement provided that the resignation would be effective only upon submission.  Therefore, Strong was still a police officer up and until March 30, 2018, when he submitted the resignation agreement.  He was still a police officer on March 29, 2018, when he applied for a disability pension.

¶ 74    Next, the circuit court determined that Strong was disabled, and that his disability was a result of the October 25, 2015, accident.  On the question of disability, the court explained that all three independent medical examiners had opined that Strong was disabled, and the Board's negative assessment of Strong's credibility should have had little or no effect on that evidence.

¶ 75    On the question of causation, the court explained:

        "In support of its *** findings, the Board reiterates that the Plaintiff's credibility was in doubt with respect to his account of being injured on [October 25, 2015], and that the Board did not credit the Plaintiff's testimony as to the cause of his injury.  But aside from the fact that the Plaintiff's recall of relevant details may have been inconsistent with supporting documents, the Court notes that the Plaintiff's account of events on [October 25, 2015] was not rebutted at the hearing."

This appeal followed.

¶ 76                                    II. ANALYSIS

¶ 77    On appeal, the Board accepts that Strong was a police officer at the time of his application and was eligible to apply for a disability pension.  The Board argues instead that Strong was not disabled, and, even if he was, the disability did not result from the performance of an act of duty.

The Board presents two bases for its denial of a line-of-duty pension: (1) Strong was not performing an act of duty when the October 25, 2015, accident occurred; and (2) even if Strong was performing an act of duty when the accident occurred, the accident did not cause the injury. Of course, if Strong did not prove that the accident caused the injury, then Strong did not prove that the injury resulted from the performance of an act of duty. The parties devote a large portion of their briefs to the question of whether Strong was performing an act of duty when the accident occurred. However, as we will explain, it is the Board's second basis for denying the line-of-duty pension, causation, that is dispositive. For the reasons that follow, we determine that the Board's disability determination was against the manifest weight of the evidence, but its causation determination was not.

¶ 78    Our review of the Board's decision to deny police pension benefits is governed by Administrative Review Law. 735 ILCS 5/3-101 *et seq.* (West 2018); *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). In administrative cases, the appellate court reviews the decision of the Board, not the decision of the circuit court. *Marconi,* 225 Ill. 2d at 531. The applicable standard of review, which determines the level of deference that we give to the Board, depends upon whether the question presented is a question of fact, a question of law, or a mixed question of law and fact. *Id*. at 532. The Illinois supreme court has determined that the questions of disability and causation present questions of fact subject to the manifest-weight standard of review. See *e.g.*, *id*. at 534 (disability); *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504-05 (2007) (disability and causation); see also *Miller v. Board of Trustees of Oak Lawn Police Pension Fund*, 2019 IL App (1st) 172967, ¶ 52 (causation). A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Marconi*, 225 Ill. 2d at 534. The "mere fact that an opposite conclusion is reasonable or

that the reviewing court might have ruled differently will not justify reversal of the administrative findings." (Internal quotations omitted.) *Id.* At the same time, our deference to the Board is not without limit. *Ashmore v. Board of Trustees of Bloomington Police Pension Fund*, 2018 IL App (4th) 180196, ¶ 41. There must be competent evidence in the record to support the Board's decision. *Miller*, 2019 IL App (1st) 172967, ¶ 40.[2]

¶ 79    The Board is charged with determining whether the officer is "disabled" for service with the police department. 735 ILCS 5/3-115 (West 2018); *Wade*, 226 Ill. 2d at 512. If the Board determines that the officer is disabled, it must then determine which type of disability pension to award. The Pension Code provides different disability benefits depending on the cause of the officer's disability. *Rose v. Board of Trustees of the Mount Prospect Police Pension Fund*, 2011 IL App (1st) 102157, ¶ 70. An officer who is disabled as a result of a performance of an "act of duty" is entitled to a line-of-duty pension equal to 65% of the salary attached to the officer's rank at the date of suspension or retirement. 40 ILCS 5/3-114.1 (West 2018). An officer who is

---

[2] Strong argues that the clearly erroneous standard of review applies. A decision is clearly erroneous only when the record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *AFM Messenger Service Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001). Contrary to Strong's position, this is not a case where the historical facts are undisputed with the remaining issue being whether the established facts satisfy the statutory standard. Here our review focuses solely on the factual issues of disability and causation. As such, and following the lead of our supreme court, we determine that the manifest weight standard of review is appropriate. Under either standard, however, our result would be the same.

disabled as a result of any other cause is entitled to a non-duty pension equal to 50% of the salary attached to the officer's rank at the date of suspension or retirement. 40 ILCS 5/3-114.2 (West 2018). The officer has the burden of proving to the Board that he is disabled and that his disability was a result of a performance of an act of duty. *Marconi*, 225 Ill. 2d at 532.

¶ 80     The Pension Code defines an act of duty as: "Any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment; or any act of heroism performed in the city having for its direct purpose the saving of the life or property of a person other than the policeman." (Emphasis added.) 40 ILCS 5/5-113 (West 2018). Activities that involve "special risk" need not be inherently dangerous. *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518, 521 (1986). The Pension Code does not envision that a police officer need have been "involved in a gun battle, a high-speed car chase, or some other obviously dangerous situation" to receive a line-of-duty pension. *Id.* at 522. The officer may be entitled to a line-of-duty pension when injured while performing a task similar to tasks performed by individuals working in civil occupations, such as driving a car. *Id.* The question becomes the capacity in which the officer was acting, *i.e.*, whether the officer was discharging a duty to protect citizens or carrying out the official orders of his office. *Id.* at 522-23. Thus, courts have determined that an officer is entitled to a line-of-duty pension when injured while on routine patrol, but not while attempting to sit down on a rolling chair during work hours. *Rose*, 2011 IL App (1st) 102157, ¶¶ 75, 84 (citing *Morgan v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 172 Ill. App. 3d 273, 276-77 (1988)).

¶ 81    The rationale for awarding a line-of-duty pension for injuries incurred while on routine patrol is that an officer on routine patrol assumes a risk that an ordinary citizen would not have to assume, specifically, that the officer must direct his attention and energy toward being prepared to react to any eventuality to protect the public. *Id.*; see also *Jones v. Board of Trustees of the Police Pension Fund of the City of Bloomington*, 384 Ill. App. 3d 1064, 1073 (2008) (routine patrol carries special risk, such as maintaining a level of constant vigilance not required of ordinary citizens, even though the act itself involves merely driving a vehicle).

¶ 82    As we have stated, the parties dispute whether Strong was in pursuit of a suspect when the accident occurred or whether Strong was involved in routine patrol when the accident occurred. The Board points to its negative assessment of Strong's credibility and argues that it was not required to believe Strong's testimony that he was in pursuit of a suspect. It notes that none of the contemporaneously prepared accident reports document that Strong was in pursuit of a suspect. The Board also points to paragraph five of the March 2018 resignation agreement, wherein Strong waived his right to pursue PSEBA health benefits in retirement by stating: "STRONG acknowledges and agrees that the incident giving rise to his alleged workplace injuries do not qualify as a catastrophic injury incurred in the line of *duty during a fresh pursuit*, in response to what was reasonably believed to be an emergency, in response to an unlawful act perpetrated by another, or during the investigation of a criminal act." (Emphasis added.) The Board argues that this statement, made in the context of a waiver of PSEBA health benefits, provided the Board with yet another basis to disbelieve Strong's testimony that he was pursuing a suspect when the accident occurred.

¶ 83    The Board's argument has more than convinced us on this point, and we defer to its factual determination that Strong was not pursuing a suspect when the accident occurred and was, instead,

involved in routine patrol. However, per *Rose* and *Jones*, routine patrol *is* an act of duty. Therefore, we turn to the dispositive issues of disability and causation.

¶ 84                                    A. Disability

¶ 85    We first address whether the Board's disability determination was against the manifest weight of the evidence. Again, the Board is charged with determining whether the officer is disabled for service with the police department. *Wade*, 226 Ill. 2d at 512. In determining whether the officer is disabled, the Board should consider the opinions of the three practicing physicians it selected to perform independent medical examinations. See *id.*; 735 ILCS 5/3-115 (West 2018). The Board may also require other evidence of disability. 735 ILCS 5/3-115 (West 2018).

¶ 86    The opinions of the examining physicians need not be unanimous. *Wade*, 226 Ill. 2d at 513-14. In considering the opinions of the examining physicians, the Board may agree with the minority position. *Marconi*, 225 Ill. 2d at 543. The Board may accept the position of a single examiner over that of the others, if the Board finds that examiner to be the most credible and persuasive. *Id.* However, the Board's decision to accept the position of a single examiner over that of the others must have a sound basis in the record. See *Wade*, 226 Ill. 2d at 507; *Coyne v. Milan Police Pension Board*, 347 Ill. App. 3d 713, 724 (2004). If the Board exercises its prerogative to accept the position of a single examiner over that of the others, it should provide an explanation for doing so. *Coyne*, 347 Ill. App. 3d at 724. Otherwise, remand may be necessary to facilitate meaningful review. *Id.* Similarly, the Board may not accept the position of a single examiner over that of the others if the position is based on misstatements or selective disregard of the evidence. *Wade*, 226 Ill. 2d at 507. In that case, the Board's decision will be found to be against the manifest weight of the evidence. *Id.*

¶ 87    Here, Strong argues that the Board's disability determination was against the manifest weight of the evidence. He points to evidence in his favor on the issue, including the unanimous opinion of every treating and examining physician. Further, he reminds this court that the Board's primary basis for denying his claim was its determination that he was not a police officer at the time of his application. He notes that the Board did not provide an explanation for its secondary determination that he was not disabled; rather, it stated only: "[Strong is] not disabled from the performance of patrol officer duties for the North Chicago Police Department." He urges that the Board's appellate counsel has now "manufactured reasons" for the Board's disability determination and that those reasons are not supported by the record. The Board, in turn, *acknowledges* that the majority of the evidence supports that Strong was disabled. It argues, however, that it was the sole arbiter of the issue and it was entitled to accept the minority position, namely Dr. Graf's position. As we explain below, we agree with Strong.

¶ 88    The evidence of disability in this case is overwhelming. Strong worked as a full duty police officer for sixteen years before he began experiencing back pain in 2016. The 2016 MRI showed a herniated disc. Strong underwent physical therapy, steroid injections, and two surgeries to try to alleviate his back pain. Every doctor's report in the record confirms that the surgeries were necessary. Alzate, who performed the surgeries, determined the following year that Strong had reached maximum medical improvement, could be a candidate for a third surgery, and was unable to return to work as a police officer. Graf, who conducted three independent medical examinations prior to Strong's pension application, recommended that Strong receive clearance from occupational health before returning to street duty, based on the pain medications he was taking, and that Strong consider a third surgery and/or undergo a Functional Capacity Evaluation. The Functional Capacity Evaluation examiner, Deters, recognized that Strong exhibited mild symptom

exaggeration but nevertheless determined that the results were reliable. Deters opined that Strong was unable to perform the job demands of a police officer.

¶ 89    Finally, all three independent medical examiners opined that Strong was disabled. Lewis was aware that Strong was under investigation by the Department for infractions that implicated Strong's honesty but, upon his own physical examination of Strong, determined that Strong was disabled. Neault wrote that "[Strong's] physical exam was without any apparent symptom exaggeration." Mardjetko believed that Strong suffered from discogenic lumbar pain syndrome. Indeed, all the treating and examining physicians reported that Strong experienced a great deal of pain and noted the heavy pain medications upon which Strong relied to function. While pain, in some instances, may be an entirely subjective measure of disability, the physicians in this case point to physical evidence. For example, Hurh, who performed the steroid injections, observed that the surgeries had left Strong with scar tissue that pressed on his nerves.

¶ 90    Moreover, as the circuit court noted, much of the evidence on the issue of disability exists virtually independent of the Board's negative assessment of Strong's credibility, including: MRI results; the completion of two surgeries; a recommendation for a third surgery; the results of physical examinations; and the effect of heavy pain medication on an officer's ability to safely perform his duties. See *Roszak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130, 143-44 (2007) (Board could not point to tangential inconsistencies regarding, for example, the applicant's living arrangements as a basis to discount the unanimous opinion of the applicant's doctors that the applicant was disabled).

¶ 91    The Board argues that Dr. Graf opined that Strong could return to work as a police officer, and it was entitled to rely on Graf's opinion to the exclusion of Drs. Alzate, Deters (DPT), Lewis, Neault, and Mardjetko. However, Graf never unequivocally stated that Strong could return to

work as a police officer. In November 2016, *before* the first surgery, Graf opined that Strong could return to work. That opinion was predicated on an optimal surgical outcome. After the surgeries, Graf's opinion was less optimistic. He recommended that Strong be evaluated by occupational health before returning to work, due to the heavy pain medication that Strong needed to function. He also recommended a third surgery and a Functional Capacity Evaluation. Thus, Graf gave, at best, a qualified endorsement to return to work. Two of Graf's contingencies, an evaluation by occupational health and a third surgery, did not occur. The third contingency, a Functional Capacity Evaluation, was completed and supports Strong's disability claim. Considered in its entirety and properly contextualized, Graf's evolving opinion does not provide a sound basis to disregard the disability assessment of the remaining doctors.

¶ 92 The Board's remaining arguments are also refuted by the record. The Board argues that Strong could perform the full duties of a police officer because he could lift 50 pounds. The Board notes that Strong lifted 50 pounds during the Functional Capacity Evaluation and he lifted 50 pounds when he lifted a passenger's suitcase while working as an Uber driver, though there is no evidence in the record as to the weight of the suitcase. However, that the duties of a police officer *include* the ability to lift 50 pounds does not mean that the ability to lift 50 pounds is the upper limit of the physical demands required of a police officer. Functional Capacity Evaluation examiner Deters estimated that Strong should be able to exert force over a 150-pound suspect, albeit on an infrequent basis. Deters did not believe that Strong was capable of meeting the physical requirements of the position.

¶ 93 The Board also argues that Strong could perform the full duties of a police officer because the positions of Target security guard and North Chicago police officer had the "same work requirements." To the contrary, Strong testified that his duties as a Target security guard required

him to remain in his security vehicle to provide deterrence and monitor a parking lot. To the extent Strong observed suspicious activity, he was to report it to his supervisor who would reach out to local law enforcement if necessary. Strong's obligations in this regard were far short of the full duties of a police officer. Just once post-accident did Strong arguably demonstrate that he, himself, believed he could perform the full duties of a police officer. That was in December 2016, when Strong applied for a position with the Lake County Sherriff. However, given that Strong underwent surgery that same month, his application shows little more than that he hoped for an optimal surgical outcome and to return to work, not that he malingered.

¶ 94    In its reply brief, the Board apparently acknowledges that it gave no explanation for its disability determination in its decision and states that it would be amenable to a remand so that it could explain its disability determination. This was the approach taken in *Coyne*, 347 Ill. App. 3d at 724. Here, however, we see no need for a remand. The Board has already told us what its explanation would be, which is refuted by the record.

¶ 95    We agree that the Board is entitled to accept the minority position, if it finds that position to be the most credible and persuasive. Here, however, the Board made no finding that Graf's opinion was the most credible and persuasive. See *Marconi*, 225 Ill. 2d at 543. Further, on appeal, the Board mischaracterizes Graf's opinion as a straightforward endorsement to return to work when, in fact, Graf qualified his opinion with contingencies that never came to pass. The Board's determination that Strong was not disabled was against the manifest weight of the evidence.

¶ 96                                    B. Causation

¶ 97    We next address whether the Board's causation determination was against the manifest weight of the evidence. Again, whether an act of duty caused an applicant to become disabled

presents a question of fact subject to the manifest weight standard of review. *Miller*, 2019 IL App (1st) 172967, ¶ 52.

¶ 98    On the issue of causation, we find *Miller* instructive. In *Miller*, the police officer applied for a line-of-duty pension. He alleged that he suffered from disabling PTSD caused by various acts of duty, including watching a suspected shooter commit suicide. The officer testified that he had not received treatment for PTSD prior to the suicide incident. The officer's testimony was contradicted by the record, which showed that, months before the suicide incident, he had received PTSD treatment to address traumatic events that he had experienced during military service. Moreover, the officer's testimony was undermined by his own police report, which made no mention that he witnessed the suicide. The Board awarded the officer a non-duty disability pension, determining that the officer was disabled but that the disability was not caused by an act of duty. *Id.* ¶ 34.

¶ 99    The *Miller* Board addressed the officer's credibility. The Board found that the officer engaged in a pattern of misrepresentation and exaggeration as to the cause of his disability. As a result, the Board discounted the opinion of an independent medical examiner who had opined that the officer's disability was caused by an act of duty. The officer had concealed information from the doctor that was necessary for the doctor to render an accurate opinion as to the cause of the disability. *Id.* In fact, that doctor specified that his opinion was premised upon the officer's truthfulness regarding the incidents in question, which included the aforementioned suicide as well as another shooting. *Id.* ¶ 30. The doctor had presciently stated that "an applicant's credibility is an important factor in allowing a doctor to make a determination on causation of his disability." *Id.* The appellate court deferred to the Board's assessment of the officer's credibility, noting that

it was supported by the record. *Id.* ¶ 41. Consequently, it affirmed the Board's determination that the officer was disabled but that the disability was not caused by an act of duty. *Id.* ¶¶ 47, 70.

¶ 100 Turning to the instant case, we recognize that there was evidence to support that the traffic accident caused Strong's back injury. Strong had an MRI in 2010 that showed a normal back. Strong performed the full duties of a police officer from 1999 until the 2015 accident, at which point he never again returned to full duty police work. A 2016 MRI, taken just months after the accident, showed abnormalities in the back that ultimately required two surgeries. Beginning in January 2016, Strong consistently told all treating and examining physicians that his back pain began in the days following the accident. All three Board-appointed independent medical examiners opined that the accident caused the injury. They all noted that Strong had no pre-existing condition and had been able to perform the full duties of a police officer up until the accident.

¶ 101 However, other evidence refuted that the accident caused the injury. Strong did not report back pain immediately after the accident. In an internal report completed the day of the accident, in the section labeled "Part of Body Injured," the following boxes were checked: head (headache), left wrist, left knee, left lower leg, and left ankle. The box labeled "back" was not checked. Similarly, Lake Forest Hospital emergency room reports make no mention of any back pain. Strong went to four doctor's appointments between October 25, 2015, and December 30, 2015, for knee pain and foot pain. At an October 29, 2015, appointment, Dr. Lee expressly noted: "[Strong] reports *** no back pain." Reports from the remaining three appointments were silent on the issue of back pain.

¶ 102 It was not until January 4, 2016, that Strong first reported back pain to a doctor, Dr. Parikh. Contrary to his October 29, 2015, report to Lee, Strong told Parikh that he had been experiencing

back pain since the accident. Also contrary to medical records, in June 2019, Strong testified before the Board that he had been experiencing back pain since the accident and that he was treated for his back pain in the emergency room. However, Strong had been reminded, as recently as January 2019 during his examination with Dr. Neault, that he had not immediately reported back pain and was not treated for back pain in the emergency room.

¶ 103    Thus, the Board was presented with two viable theories of causation: (1) the accident caused the injury; or (2) the accident did not cause the injury; rather, the cause of the injury was unknown (or known only to Strong) and occurred sometime between October 29, 2015, when Strong informed Lee that he was not experiencing any back pain, and January 4, 2016, when Strong first reported back pain. The Board, having formed a negative assessment of Strong's credibility, reasonably found that the evidence supported the second theory.

¶ 104    We defer to the Board's assessment of Strong's credibility. Strong's testimony was contradicted by the record in many respects. As noted, Strong's testimony and the medical records conflict as to when his back pain started. Similarly, Strong's testimony and the internal Department report conflicts as to when his back pain started. Unlike the circuit court, the Board reasonably found these discrepancies to be highly relevant.

¶ 105    Further, the evidence supports that Strong has historically lacked candor with his supervisors. Strong initially did not report that he was in pursuit of a suspect when the accident occurred. Two reports completed the date of the accident asked, "Describe What Happened," "What was the Employee Doing When the Accident Occurred," and "How did the Accident Occur," yet Strong did not answer any of these prompts with an explanation that he had been in pursuit of a suspect. In addition, Strong previously had been disciplined for acts of dishonesty, such as falsifying a police report. Although this latter evidence does not speak directly to the issue

of causation, it is relevant to the Board's overall determination that Strong was not a credible witness.

¶ 106   Given that the Board did not find Strong to be credible, it may reasonably have discounted some of the evidence in Strong's favor.  As in *Miller*, because Strong provided his doctors with contradictory information as to when his symptoms started, the Board may have reasonably discounted those doctors' opinions as to causation.  Also as in *Miller*, it follows from the Board's negative assessment of Strong's credibility that Board could have reasonably determined that the injury did not occur as Strong claimed.  As the doctor in *Miller* observed and as Dr. Graf has suggested here, when a doctor documents what a patient has told him in a patient history, that information may or may not be consistent with the medical evidence.  Stated otherwise, a doctor's causation opinion may in some instances rely in whole or in part upon the patient's truthfulness. If Strong did not prove that the October 25, 2015, accident caused the injury, then Strong did not prove that the injury resulted from the performance of an act of duty.  He is not entitled to a line-of-duty pension.

¶ 107   As a final point, we note that Strong is unable to successfully distinguish *Miller*.  Strong argues: "Unlike in *Miller*, here, the Board failed to make any credibility determinations, and failed to argue any alleged credibility determinations relevant to Strong's disability claim." As discussed above, this is simply not accurate.  The Board *did* determine that Strong was not credible: "The Pension Board rejects the Applicant's testimony at the hearing. The Pension Board finds the Applicant's testimony as not creditable." Moreover, the inconsistencies as to when Strong's back pain began were highly relevant to the issue of causation, and the remaining inconsistencies were relevant to Strong's overall credibility.  The Board's assessment of Strong's overall credibility guided it to credit or discount other evidence, such as the examining doctors' opinions on

causation. The Board's determination that the accident did not cause Strong's back injury was not against the manifest weight of the evidence.

¶ 108   In sum, this disability pension case arose during the unusual circumstances of negotiations for Strong's resignation. The Board primarily denied Strong's pension claim on eligibility grounds. It entered conclusory findings as to the issues before us on appeal, particularly as to the disability determination. The main basis it now offers, that Dr. Graf opined Strong could return to work as a police officer, is not supported by the record. Graf determined that Strong could return to work only upon completion of certain conditions, which were not met. With every other treating and examining physician determining that Strong is unable to work as a police officer, the record overwhelmingly establishes that Strong is disabled. The circuit court recognized that the Board's negative assessment of Strong's credibility may have led the Board to deny Strong's claim when it did not have grounds to do so. However, we determine that the circuit court overcorrected for that perceived bias. The Board had legitimate bases to find aspects of Strong's testimony unreliable, and we defer to the Board's factual determinations regarding the cause of Strong's injury. As such, while we hold that the Board's disability determination was against the manifest weight of the evidence, we hold that the Board's causation determination was not. Strong is disabled, but his disability was not the result of the performance of an act of duty. He is entitled to a non-duty pension.

¶ 109                                    III. CONCLUSION

¶ 110   For the reasons stated, the decision of the Board is affirmed in part and reversed in part. The decision of the circuit court, which reversed the Board in total, is affirmed in part and reversed in part.

¶ 111   Affirmed in part and reversed in part.