2024 IL App (1st) 240137-U

No. 1-24-0137

Order filed November 15, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| TIMOTHY R. BARZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| THE VILLAGE OF HAZEL CREST FIREFIGHTERS | ) | No. 2023 CH 00632 |
| PENSION FUND, THE BOARD OF TRUSTEES OF | ) | |
| THE VILLAGE OF HAZEL CREST FIREFIGHTERS | ) | |
| PENSION FUND, and THE VILLAGE OF HAZEL | ) | |
| CREST, | ) | Honorable |
| | ) | Michael T. Mullen, |
| Defendants-Appellants. | ) | Judge, presiding. |

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's judgment reversing the Board's denial of a line of duty
disability pension, where the manifest weight of the evidence supports the
determination that plaintiff's disability was caused by a duty-related incident.

¶ 2    Defendants the Board of Trustees of the Village of Hazel Crest Firefighters Pension Fund

(Board) and the Village of Hazel Crest (Village) appeal the circuit court's order reversing the

decision of the Board, which denied plaintiff Timothy Barz's application for a line of duty disability pension pursuant to section 4-110 of the Illinois Pension Code (Code) (40 ILCS 5/4-110 (West 2020)). We affirm the circuit court's order and reverse the Board's decision.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Barz's Injuries

¶ 5     Barz was hired by the Village of Hazel Crest Fire Department (HCFD) in October 2011 as a firefighter/paramedic. On February 6, 2020, Barz applied for a line of duty disability pension and, alternatively, a non-duty pension. On August 17, 2021, the Board held a hearing on Barz's application, where it heard the testimony of Barz and received documentary evidence and voluminous exhibits.

¶ 6     At the hearing, Barz alleged that he sustained on-duty injuries to his left ankle on January 2, 2018, and May 5, 2018. Barz claimed that these injuries caused him to develop complex regional pain syndrome (CRPS), rendering him permanently disabled. The Village argued that there was no connection between Barz's injuries and his disability. In support of its position, the Village pointed to evidence regarding Barz's farming operation while he was recovering from his injuries and after he was cleared to return to work.

¶ 7     The record shows that on January 2, 2018, Barz responded to an elevator alarm at a multifamily dwelling in Hazel Crest where he suffered a sprained ankle after he stepped off the fire engine and rolled his ankle. Barz testified he felt a "slow burning feeling" that immediately "fill[ed] into [his] boot." Barz did not complete any further activities on the call due to his injury and immediately informed his lieutenant. Barz's shift ended at 7:00 a.m. on January 3, 2018, at which time he went to see Dr. Mark Veldman. Dr. Veldman was the first to diagnose Barz with a

sprain on his left ankle and restricted him from working. He advised Barz to engage in physical therapy twice a week for three weeks and provided him with additional care instructions.

¶ 8     Physical therapy records dated February 16, 2018, indicate that Barz had, by that point, attended 15 physical therapy sessions but still had "soreness in his foot." On February 26, 2018, Barz went to see Dr. Thomas Regan for left ankle pain. A letter from Dr. Regan indicates Barz had "a full range of motion, "good stability to his ankle," and "a little bit of tenderness medial and anterior." Barz's diagnostic imaging indicated "some peroneus brevis pathology" but Dr. Regan was unsure of "the exact etiology" of Barz's symptoms and whether they were "related to the peroneus brevis."

¶ 9     The record contains a medical evaluation report dated March 2, 2018, authored by Dr. Anand Vora, who evaluated Barz for a worker's compensation examination at the request of the Village's insurance carrier. Dr. Vora diagnosed Barz with an ankle sprain related to the January 2, 2018, incident. The location of symptoms were "inconsistent with that of the findings of the MRI of peroneal tendon tear." Dr. Vora opined that it was "unlikely" that Barz's peroneal tendon pathology had "any clinical correspondence" to his ankle sprain. Dr. Vora recommended that Barz restart physical therapy.

¶ 10    Barz's physical therapy records from March 27, 2018, show he "was doing better with initiation of therapy," but he "noticed a large increase in swelling" after walking around a store. Barz "regain[ed] full mobility" of his left ankle and demonstrated "fairly good overall strength" in his left ankle. However, he had not "progress[ed] to any higher level strengthening" and "continue[d] to have difficulty with progressing to job sim activities and strengthening" due to the continued soreness in his ankle.

¶ 11    Dr. Regan reevaluated Barz on March 29, 2018. According to Dr. Regan, Barz's ankle stability was "good," but "[i]t sound[ed] like [Barz] ha[d] some peroneal disease" and had reached a plateau. Dr. Regan prescribed medications to Barz, recommended he discontinue physical therapy, and referred him to Dr. Armen Kelikian. On April 9, 2018, Barz saw Dr. Kelikian, who opined that Barz was "unable to work until further notice" and needed left ankle surgery to correct a peroneal tendon tear.

¶ 12    On April 30, 2018, Dr. Vora prepared a report titled "IME Addendum." Dr. Vora reviewed, *inter alia*, Barz's medical records from an April 19, 2018, visit to Dr. Ward McCracken, a different treating physician. Dr. Vora also reviewed surveillance videos of Barz taken by the Village's insurance carrier in April 2018.[1] According to Dr. Vora, Dr. McCracken took an ultrasound of Barz's ankle, which showed "inconclusive evidence to suggest peroneal subluxation." Dr. Vora watched the surveillance videos and described his observations of Barz as follows:

"[W]alking with a reciprocal heel-toe gait pattern with a normal gait and cadence through what appears to be a farm on uneven surfaces, riding heavy machinery including an ATV, observed [him] carrying objects including what appear[ed] to be a shovel and pail of some type without any limitation noted, driving a vehicle without any apparent limitations, observe[d] walking through a store with [*sic*] pushing a cart with normal gait and cadence, no evidence of limitation, carrying food and objects in his hand with normal gait and cadence, normal reciprocal heel-toe gait pattern, and getting in and out of a vehicle including a truck with no apparent limitations. [Barz was] observed pushing a cart on a

---

[1] There is reference in the record to surveillance videos taken of Barz in April and May 2018 and in 2020, but there are no videos in the record for us to review.

separate day on surveillance video with normal heel-toe gait pattern, and pushing what appear[ed] to be gardening type of soil multiple bags stacked upon one another in the cart and lifting this in and out of the truck with no apparent disability with normal gait, cadence, and reciprocal heel-toe gait pattern with no functional disability appreciated."

¶ 13    Dr. Vora found "no objective basis" for Barz's lack of progression "based on any objective clinical examination." In support, Dr. Vora noted that diagnostic images of Barz's left ankle "confirm[ed] the tendons to be normal *** with no evidence of instability or weakness." Dr. Vora further opined that Barz "does not require any treatment whatsoever based on any objective clinical parameter." Rather, he could return to work "full duty without restrictions" and had reached maximum medical improvement.

¶ 14    On May 3, 2018, the Village informed Barz that his surgery was not approved, and he was to return to HCFD for full duty work. Barz testified he would have been terminated had he not reported back to work. So, on May 5, 2018, under the threat of losing his job, he returned to work.

¶ 15    On May 5, 2018, Barz was dispatched to a residence to help a fall victim. At the scene was an older 300-pound patient who needed help getting out of a bathtub. Barz and his partner stepped inside the bathtub. When they lifted the patient, Barz "felt his [left] ankle give out again." Barz felt "[p]ain, instability," "swelling, [and] hotness" in his left ankle. After this incident, Barz was dispatched to another location for a "stabbing call." He reported his ankle injury to his lieutenant after completing the call and then went to Advocate South Suburban Hospital for treatment. On May 8, 2018, Barz was formally placed on work restrictions.

¶ 16    On May 14, 2018, Barz had an ultrasound taken of his left ankle. A progress note from Dr. McCracken indicates that Barz's "[p]rior split tear seen on previous MRI [was] difficult to

demonstrate on [this] examination." Based on the ultrasound, Dr. McCraken found evidence of "at least partial subluxation of the peroneal tendons."

¶ 17    On May 23, 2018, Barz submitted to a second medical evaluation with Dr. Vora, who opined Barz suffered an acute injury on May 5, 2018, "consistent with *** a new injury." Dr. Vora believed surgery on Barz's left ankle was reasonable and necessary. Dr. Vora gave this opinion even after seeing the original surveillance videos taken in April 2018, as well as additional surveillance videos taken on May 16 and 17, 2018, showing Barz on his farm riding a John Deere lawn mower with a front attachment.

¶ 18    On May 31, 2018, Dr. Kelikian performed surgery on Barz's left ankle. The surgery involved a "left ankle retinacular repair, brevis repair, and groove deepening." Barz engaged in physical therapy and medical treatment and took medication to manage his pain. He was off work for several months and finally cleared to return to work with no restrictions in November 2018. A November 12, 2018, physical therapy note states that Barz is "able to perform all [of his] job demands per [the] job description with out [*sic*] significant reports of pain or noted compensation." Barz was thereafter discharged from physical therapy and returned to full duty work.

¶ 19    Barz testified that after he was released for full duty work, carrying weight "was getting harder and harder." He treated his ankle pain with "ibuprofen and ice" but had trouble descending stairs and with "elevation." Barz felt his "tendons would just kind of move" and he experienced increased instability and swelling. Barz continued to perform his job duties, did not report any subsequent injuries to his left ankle, and did not recall missing work between November 20, 2018, and June 2019. Nonetheless, Barz's pain persisted and in Spring 2019, Barz reported "discomfort"

in his ankle to his lieutenant and Dr. Kelikian. Barz also consulted with Dr. David Garras at Midwest Orthopedic Consultants.

¶ 20     Medical records from Midwest Orthopedic Consultants dated April 25, 2019, show that Dr. Garras took X-rays of Barz's left ankle, which did not show fractures or dislocations. Dr. Garras diagnosed Barz with left peroneal tendinitis with possible retear and "[o]ther instability" of the left ankle. Dr. Garras ordered further diagnostic imaging of the left ankle.

¶ 21     Medical records from a June 12, 2019, appointment with Dr. Garras state that Barz "sprained his ankle [a] couple times since [Dr. Garras] last saw him." Although the note uses the word "sprain," Barz did not think he used the word "sprain." Rather, he told Dr. Garras his ankle gave out a couple times, but he could point to no new injury, nor did he seek treatment for a subsequent specified injury.

¶ 22     Dr. Garras restricted Barz from working and recommended a second surgery. On July 12, 2019, Dr. Garras performed a second surgery on Barz's left ankle. An operative report notes that Barz's "peroneus brevis had an extension of the previous tear with nonhealing of the old tear. This was debrided and then repaired and tubularized. The peroneus longus had a very small tear in it, which was also debrided and repaired."

¶ 23     After Barz's second surgery he was restricted from returning to work. He testified he had difficulty walking on his left foot and experienced hypersensitivity, continued instability, and swelling. On September 19, 2019, Dr. Garras referred Barz to pain specialist Dr. Matthew Jaycox to be evaluated for complex regional pain syndrome (CRPS) due to his continued pain, instability, and slow progression in recovery. On October 21, 2019, Dr. Jaycox diagnosed Barz with CRPS of the left lower leg and foot.

¶ 24    Despite being on work restrictions and a little sore, Barz tried to be more active around his home. In the Fall and Winter of 2019, he told this to Dr. Garras and the physical therapist at Athletico, who encouraged him to exercise. The medical providers knew Barz was doing yard work and remaining active around his house, but there is no mention of farming. There is, however, reference to Barz walking on uneven surfaces and reports of him falling while walking on uneven ground.

¶ 25    On November 1, 2019, and December 6, 2019, Barz underwent two "lumbar sympathetic nerve block" procedures to help with the pain. In early 2020, he had a spinal cord stimulator implanted into his back on a trial basis. In mid-February 2020, Barz submitted his application for a line of duty disability pension.

¶ 26    On April 29, 2020, Barz had another surgery to permanently implant the spinal cord stimulator into his back. Following this procedure, Barz experienced "75 to 80 percent" relief from pain, and the hypersensitivity in his ankle "wasn't as bad." On August 27, 2020, Barz was released by his treating physicians to work with permanent restrictions. However, he was not assigned to a new position at HCFD consistent with those restrictions and he never returned to work.

¶ 27                        B. Independent Medical Evaluations

¶ 28    Between November 2020 and February 2021, the Board retained Dr. Michael Pinzur, Dr. Michael Peters, and Dr. Geeta Nagpal to perform independent medical evaluations on Barz pursuant to his line of duty disability pension application. According to the cover letters that the Board sent to the evaluators, the Board provided Barz's disability application, job description, workers compensation documents, medical records, and Dr. Vora's IME reports. The Board requested the evaluators' opinions regarding the extent, cause, and duration of Barz's disability,

his current limitations and potential to fully recover, and whether his subjective complaints aligned with the evaluators' findings.

¶ 29    As Judge Mullen noted in his oral ruling, the Board's questions to the three independent medical evaluators were clearly suggestive to put them on notice that Barz may be exaggerating his disability, and that his disability may have resulted from something other than the two 2018 on-duty injuries. The Board apparently did not send the doctors the surveillance videos, but the April 2018 videos are described sufficiently in Dr. Vora's IME Addendum and would alert the three doctors to the fact Barz lives on a farm and was observed doing some manual labor on a farm, riding machinery including an ATV, and lifting heavy bags without noticeable difficulty.

¶ 30    Dr. Pinzur examined Barz on December 15, 2020. Dr. Pinzur's letter to the Board notes that Barz "had a work-related injury with a peroneal tendon injury," underwent two surgeries, and developed CRPS. Dr. Pinzur opined that Barz "is not capable of doing more than the *** sedentary work level" and that his disability was permanent.

¶ 31    Dr. Peters examined Barz on January 14, 2021. Dr. Peters' letter to the Board notes that Barz is "disabled from performing full duties due to" CRPS, which is "likely permanent" and "likely solely due to" plaintiff's two on-duty injuries. Dr. Peters indicated that Barz's subjective complaints were consistent with his diagnostic imaging.

¶ 32    Dr. Nagpal examined Barz on March 1, 2021. Dr. Nagpal's letter to the Board states that Barz has CRPS and cannot return to full and unrestricted firefighter duties. Dr. Nagpal noted that Barz's "disability may last for years to come" and that he reached maximum medical improvement. Dr. Nagpal further opined that Barz's CRPS diagnosis and disability "is a direct result of" his

injuries from January 2, 2018, and May 5, 2018, and that his subjective complaints are consistent with his diagnostic imaging.

¶ 33                                    C. Barz's Interrogation

¶ 34    On August 3, 2021, Barz submitted to a formal interrogation with the Village pursuant to the Firemen's Disciplinary Act. 50 ILCS 745/3 (West 2020). The transcript and exhibits from this interrogation were entered into the administrative record and are a part of the common law record. They are relevant mainly to evidence Barz's farming operation, which the Board relied on heavily to deny a line of duty disability pension and find Barz was not truthful.

¶ 35    At the interrogation, Barz attested that he resides on 52 acres of farmland in Grant Park, Illinois. Barz farms his property and cares for approximately 20 chickens and 10 hogs. In 2020, he began farming an additional 82 acres owned by his neighbor.

¶ 36    Prior to his January 2, 2018, injury, Barz farmed his land, planting soybeans and corn, with the help of a neighbor Richard Riechers. However, in 2018, Riechers planted and harvested all 52 acres. Barz testified he took care of his chickens and hogs, but he did not do any planting himself that year. Riechers would sell the crops for Barz to the Grant Park Cooperative and Barz would pay him based on the amount sold. Grant Park Cooperative issued checks to Barz in the amount of $3,981.42 in 2017, $31,058.17 in 2018, $18,743.18 in 2019, and $66,585.87 in 2020. The spike has to do with the additional 82 acres Barz began renting in 2020.

¶ 37    Despite being off work, Barz began planting soybean and corn seeds himself with the help of Gerald Teson in 2020 and 2021. Barz testified "[n]ot much" physical exertion is required to plant seeds, which involves light moving, lifting 40-pound bags of seed, "walk[ing] around a little bit," driving a vehicle, and climbing up and down a few steps of the tractor. Barz's tractor had a

clutch pedal that needed to be depressed to shift into the proper gear. Barz would use his left foot to press the clutch until "it g[ot] sore and worn out," at which point he switched to pressing the clutch with his right foot.

¶ 38    Barz testified he only plants the seeds in the Spring but does not harvest the crops himself. He stated it takes about three to four hours, maybe longer, to plant the seeds on his farm, and that everything is moved by equipment. He described the planting process as filling his drill with seeds using an auger. He uses a forklift to move the auger and drives the tractor to plant seeds. Barz also rides a lawnmower to maintain his untillable land. While he would experience "a little bit of discomfort on [his] ankle" while doing this, he believes it is within his current capacity. Barz described his farm work as seasonal and minimal, which is in stark contrast to the daily demands of a firefighter/paramedic.

¶ 39    While defendants do not contest Barz's permanent disability and inability to perform full duty work as a firefighter/paramedic, they take issue with Barz's alleged lack of candor about his farming operation. Although the medical records and physical therapy notes refer to Barz keeping active and walking on uneven surfaces at home, there is no direct reference to farming or planting seeds. Barz testified he "possibly may have" told the physicians about his farming operation in 2019 but could not recall who. Barz admitted that on June 12, 2019, Dr. Garras, plaintiff's treating physician, advised Barz to "only perform ground level work." Notwithstanding, Barz planted seeds earlier that Spring with the help of Teson and expanded his farming operation in 2020 by renting an additional 82 acres.

¶ 40    When presented with the surveillance videos from 2018, Barz admitted that it was him riding an ATV on his farm, walking across his property, and carrying a hydraulic jack that weighed

20 to 30 pounds. One surveillance video depicted him pushing a cart loaded with "four or five" 50-pound bags inside a store and loading the bags into his truck. Another video showed him riding a lawnmower around his property. Barz acknowledged he was engaged in "these sorts of activities" throughout May 2018, even though he was restricted from work duty between April 9, 2018, and virtually all of May 2018.

¶ 41                                    D. Board's Final Decision and Order

¶ 42    On August 17, 2021, shortly after Barz's interrogation, the Board held a hearing on Barz's disability pension application. At the request of the Village's attorney, the Board continued the hearing for the Village to show the surveillance videos of Barz on his farm to Drs. Pinzur, Peters, and Nagpal, take their evidence depositions, and submit them to the Board. There are no evidence depositions in the record, and it is unclear whether the evaluators saw the videos. If they did, their opinions remained unchanged.

¶ 43    On May 4, 2022, nearly nine months after the continuance was granted, the Board issued a final written Decision and Order, denying a line of duty disability pension but awarding Barz a non-duty disability pension of 50% of his salary. In doing so, the Board found Barz "failed to meet his burden of establishing his injury resulted from an ' act of duty ' " based on (1) his rehabilitation and return to full duty work following his injuries, (2) his "operation and expansion" of his farm, (3) his failure to disclose his farming activities to his treating physicians, (4) and the "lack of any work-related injury causing his disability." Most damning to Barz's case is that the Board found Barz "was not truthful with respect to his claim since he failed to advise any of the medical professionals he was actively engaged in farming activities while recovering and rehabbing from the ankle injuries."

¶ 44                    E. Circuit Court's Reversal of the Board's Decision

¶ 45    On January 23, 2023, Barz filed a complaint for administrative review with the circuit court, alleging the Board's denial of his application was against the manifest weight of the evidence. He further alleged the Board's determination that he did not establish a connection between his injuries and his disability was arbitrary and capricious. The circuit court agreed, and on December 21, 2023, reversed the Board's decision denying Barz a line of duty disability pension, finding it was against the manifest weight of the evidence.

¶ 46                              II. STANDARD OF REVIEW

¶ 47    Judicial review of pension board decisions is governed by Administrative Review Law. In administrative cases, we review the decision of the Board, not the decision of the circuit court. *Marconi v. Chicago Heights Police Pension Board,* 225 Ill.2d 497, 531 (2006). We may not consider new or additional evidence beyond what was presented to the Board, and the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2020). It is within the Board's province to accord weight to the evidence, resolve conflicts presented by the evidence, and determine the credibility of witnesses. *Prawdzik v. Board of Trustees of Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 36. We defer to the Board on questions of fact unless its findings are against the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident. *Marconi,* 225 Ill.2d at 532.

¶ 48    Although we may not reweigh the evidence or make an independent determination of the facts, "the deference we afford the administrative agency's decision is not boundless." *Wade v. City of North Chicago Police Pension Board,* 226 Ill.2d 485, 507 (2007). There must be competent evidence in the record to support its decision. *Miller v. Board of Trustees of Oak Lawn Police Pension*

*Fund,* 2019 IL App (1st) 172967, ¶ 40. "Even when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon consideration of all the evidence the finding is against the manifest weight." *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211-12 (2006).

¶ 49                                  III. ANALYSIS

¶ 50     It is undisputed that Barz is disabled. The only question is whether the Board's decision to deny Barz a line of duty disability pension is against the manifest weight of the evidence.

¶ 51     Section 4-110 of the Code provides that if a "firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty" becomes "physically or mentally permanently disabled," then "the firefighter shall be entitled to a disability pension equal to the greater of" 65% of the firefighter's monthly salary at the time he is removed from the payroll, or the retirement pension he would be eligible to receive if he retired. 40 ILCS 5/4-110 (West 2020).

¶ 52     Under section 4-110 of the Code, a firefighter is "considered 'on duty' while on any assignment approved by the chief of the fire department" so long as "the assignment is related to the fire protection service of the municipality." *Id.* The phrase " ' incurred in or resulting from the performance of an act or acts of duty' " includes when "the injury was a cause of [an applicant's] disability" or when the applicant "aggravated a preexisting injury as the result of an act or acts of duty." *Howe v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 2015 IL App (1st) 141350, ¶ 55 (citing *Wilfert v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 263 Ill. App. 3d 539, 544-46 (1994)). There is no requirement that an on-duty injury be the primary or sole cause of a disability, so long as it is an aggravating, contributing, or

exacerbating factor. *Village of Oak Park v. Village of Oak Park Firefighters' Pension Fund,* 362 Ill. App. 3d 357, 371 (1st Dist. 2005).

¶ 53     Here, the manifest weight of the evidence shows Barz's 2018 on-duty injuries were clearly a causative and contributing factor in his disability, and the Board erred in ignoring the three independent medical evaluators' reports and documentary evidence showing a causal connection. Moreover, there is no competent evidence to support the Board's determination that Barz fully recovered from his second on-duty injury such that it did not contribute to his disability. Nor is there evidence that an off-duty injury broke the causal chain or that Barz lied or concealed information to his medical providers to such an extent to warrant the Board completely discarding the independent medical opinions of Drs. Pinzur, Peters, and Nagpal, which point to a line of duty disability pension.

¶ 54     Defendants make much ado over the fact Drs. Pinzur, Peters, and Nagpal did not address, reference, or comment on Barz's farming operation or the surveillance videos, which the Board found highly relevant. However, they ignore the fact that the August 17, 2021, hearing was continued at the Village's request to show these doctors the surveillance videos and take their evidence depositions. This was designed to rebut Barz's testimony and demonstrate his disability was exaggerated and not casually connected to his 2018 work-related injuries.

¶ 55     As stated above, the record does not reflect the evidence depositions were ever taken or that the evaluators saw the videos. If they saw them, their opinions did not change. If they did not, then the Village failed entirely to discredit the evaluators' opinions and ask if their opinions would change if they knew about Barz's work on the farm. Defendants cannot remain mute, let the

doctors' opinions stand, and then cast blame on Barz by speculating that he lied without competent evidence in the record.

¶ 56    While the Board has the authority to judge Barz's credibility, there is simply no evidence to support the Board's finding that Barz lied or concealed anything. It is pure supposition to suspect Barz was not forthright about causation based on the lack of commentary about farming in the medical documentation. Barz testified he may have mentioned farming to a medical provider in 2019, albeit he could not remember who. Nonetheless, he told his treaters he was trying to stay active, had difficulty walking on uneven surfaces in his yard and around his home, had difficulty on ladders and unbalanced surfaces, and had fallen a few times due to ankle instability. What's more, the April 2018 videos depicting Barz walking on his farm, riding "heavy machinery," and loading and lifting 50-pound bags into his truck, were described in detail in Dr. Vora's IME Addendum. The independent medical examiners had this information when they gave their written opinions and still found Barz's 2018 on-duty injuries were the cause of his disability.

¶ 57    The Board unduly emphasizes the extent and nature of Barz's farming operation. The evidence shows Barz did no farming at all in 2018. While he acquired 42 acres and increased production, he hired a neighbor to plant and harvest his crops. Barz acknowledged he did some of the planting himself with the help of a neighbor in the Spring of 2019, but this is also at a time when he was back to work on unrestricted duty. In 2020, Barz began renting an additional 82 acres from his neighbor, and admitted he planted seeds in the Spring while he was off work and after he had applied for disability. However, the planting season is short, and Barz said it takes three to four hours to plant his land, maybe more, and he never harvests the crops himself. Barz also described how the machines do most of the work and his only discomfort comes from using the

clutch and having to switch feet. Barz feeds his chickens and hogs, but there is no evidence these activities resulted in a new or intervening injury that broke the casual chain between his 2018 work-related injuries and CRPS diagnosis.

¶ 58     Barz testified that after his second surgery he had trouble with elevation and descending stairs, and increased instability and swelling in his ankle. He felt his tendons "would just kind of move." The medical records show Barz is capable of static lifting heavy objects; the difficulty comes when he adds a dynamic component to it, such as running or climbing ladders and stairs with heavy equipment. There is no evidence Barz's farming operation requires this of him, but his work as a firefighter/paramedic does.

¶ 59     The timing of Barz's injuries, surgeries, and diagnosis is important. It is undisputed Barz suffered two separate injuries to his left ankle in 2018 while at work. Inexplicably, the Board found "no evidence was introduced to establish an 'act of duty' " for the January 2, 2018, incident. However, the undisputed, corroborated evidence shows Barz twisted his left ankle on January 2, 2018, while stepping off a fire engine when responding to a call. The Board's finding is clearly against the manifest weight of the evidence.

¶ 60     As to the May 5, 2018, injury, defendants acknowledge it was an act of duty that caused Barz's ankle sprain and necessitated the first surgery on May 31, 2018. This resulted in months of physical therapy, medication, and treatment, and in November 2018, Barz was cleared to return to work. Barz testified that the pain and instability in his ankle persisted and worsened over the seven months he worked without restrictions, prompting him to seek treatment in the Spring of 2019. This ultimately led to a second surgery in July 2019, which in turn led to his CRPS diagnosis on October 21, 2019.

¶ 61    True, Barz planted seeds and fed his chickens and hogs in Spring 2019, but there is no evidence of a separate and distinct injury between November 2018 and June 2019 that would break the casual connection between his work-related injuries, two surgeries, and continued pain in his left ankle and foot, labeled as CRPS. There is also no medical evidence connecting his farming activities performed in 2019 or 2020 to his CRPS disability. To the contrary, Dr. Nagpal found Barz's CRPS developed after his two surgeries as a direct result of his two 2018 injuries. Dr. Peters also opined his CRPS "likely resulted from two duty surgical ankle injuries that occurred [in] 2018." Dr. Pinzur also found Barz suffers from CRPS after undergoing two surgeries. None of them pointed to any other cause or intervening event for Barz's permanent disability. Nor did any other medical provider.

¶ 62    At most, there is a note in Dr. Garras's records from June 12, 2019, that says Barz "sprained his ankle [a] couple times" since last time he saw him in April. Barz was working as a firefighter at the time and admitted his ankle continued to give out and he had ankle instability, especially while climbing ladders and moving swiftly. He testified he did not recall using the word "sprain," and could point to no discrete new injury that required treatment. It was the same old feeling of weakness and instability that haunted Barz since 2018, and carrying weight while on the job "was getting harder and harder." Regardless, even if there was another sprain, of which there is no medical evidence, Barz's 2018 injuries do not have to be the sole proximate cause of his disability. See *Village of Oak Park,* 362 Ill.App.3d at 371 (it is sufficient that an act of duty be an aggravating, contributing, or exacerbating factor).

¶ 63    It is clear to us that the Board denied Barz an on-duty pension because it thought he lied to the medical treaters and evaluators about his farming operation by not disclosing it. Barz testified

he mentioned it, and it is clear from the medical records and surveillance videos that at least some of the medical providers knew he was walking on uneven surfaces at home, working in his yard, operating equipment, and keeping active overall. No one testified Barz lied or concealed anything. In fact, it is defendants who seemingly withheld what they knew by failing to ask the doctors how their opinions might have changed, if at all, based on the surveillance videos and Barz's farming operation. As Judge Mullen observed, the absence of references to his farming activities in his medical records does not mean Barz lied or concealed information. More likely, the evaluators found Barz's activities insignificant and did not break the causal chain between his 2018 injuries and disability.

¶ 64    Defendants rely primarily on two cases for the proposition that the Board may discount the opinions of medical providers where the applicant's credibility is impugned. See *Miller v. Board of Trustees of the Oak Lawn Police Pension Fund,* 2019 IL App (1st) 172967; *Strong v. Board of Trustees of the North Chicago Police Pension Fund,* 2021 IL App (2d) 200417-U. Both cases are distinguishable.

¶ 65    In both cases, there was at least one minority medical opinion that the Board could accept to deny benefits where it found that opinion to be the most credible and persuasive. Additionally, in *Strong,* a nonprecedential Rule 23 order, there was evidence that Strong historically lacked candor with his supervisors and had been disciplined in the past for lack of honesty. *Strong*, 2021 IL App (2d) 200417-U, ¶ 105. In *Miller*, Miller lied about his medical history, suspension, and pending criminal charges, and his testimony was contradicted by his own reports, dispatch log information, and other police officer testimony. *Miller*, 2019 IL App (1st) 172967, ¶ 41.

¶ 66    Here, there is no direct evidence that Barz lied, either in the past or present, and there are no minority medical opinions for the Board to accept. All medical opinions favor Barz. The Board discounted them all and assumed Barz lied. The Board assumed the medical opinions would have changed had the evaluators known more details about Barz's farming operation. However, there is no evidence to support this, even though the August hearing was continued at the Village's request for this exact purpose. The Board also jumped to the conclusion that there was an intervening non-work-related injury that broke the causal connection between Barz's 2018 injuries and his disability. Again, there is no evidence of this in the record; just a conjecture, which makes the Board's decision against the manifest weight of the evidence.

¶ 67                                    IV. CONCLUSION

¶ 68    Despite the deference we give to administrative decisions, the Board's decision must be supported by some competent evidence in the record. Here, no competent evidence supports the Board's findings that Barz fully recovered following his second 2018 injury, that his 2018 injuries were not a causative or contributing factor of his disability, that he suffered an off-duty injury that broke the causal chain, or that he lied or concealed information regarding his farming activities. Because we are left with a firm conviction that the Board's decision is against the manifest weight of the evidence, we affirm the circuit court's order reversing the Board's decision, which denied plaintiff a line of duty disability pension.

¶ 69    Circuit court judgment affirmed.

¶ 70    The Board's decision reversed with instruction to award Barz a line of duty disability pension instead of a non-duty disability pension.